IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:04 CV 327-H

| | |
|---|---|
| PAMELA BEVERLY,<br><br>    Plaintiff,<br><br>v.<br><br>GENUINE PARTS CO. d/b/a NAPA,<br><br>    Defendant. | **MEMORANDUM AND ORDER** |

**THIS MATTER** is before the Court on the following motions and memoranda:

1. the Defendant's "Motion for Summary Judgment" and "Brief in Support . . ." (document #36) filed on January 20, 2006;

2. the Plaintiff's "Memorandum in Opposition . . ." (document #39) filed on February 21, 2006;

3. the Defendant's "Reply . . ." (document #43) filed on April 3, 2006;

4. the Defendant's "Motion to Strike" and "Memorandum of Law in Support . . ." (document #44) filed on April 3, 2006;

5. the Plaintiff's "Memorandum in Opposition . . ." (document #45) filed on April 17, 2006; and

6. the Defendant's "Reply . . ." (document #46) filed on April 24, 2006.

The parties have consented to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c), and this motion is now ripe for disposition.

Having carefully considered the parties' arguments, the record, and the applicable authority, the undersigned will <u>deny</u> the Defendant's Motion to Strike, but <u>grant</u> its Motion for Summary

Judgment, as discussed below.

## I. PROCEDURAL AND FACTUAL BACKGROUND

This is an action seeking relief for retaliation-based termination and gender-based discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(e)(1) ("Title VII"), and the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621, as well as state public policy.

The Defendant is a corporation which distributes automotive replacement parts and operates a distribution center in Charlotte, North Carolina. The Plaintiff was originally hired in June 1993 as a stocker in the Charlotte distribution center. She received periodic wage increases and several promotions, including a promotion on September 1, 1999 to Assistant Human Resources Manager. As Assistant Human Resources Manager, the Plaintiff's duties included, among others, handling payroll, assisting with hiring, addressing insurance issues, completing termination forms for employees, being mindful of employment issues which could expose the company to legal liability, and helping Human Resources Manager Alvin Hill with morale boosters for the employees from time to time. The Plaintiff was terminated on November 19, 2002.

During the Plaintiff's employment with the Defendant, there are essentially three distinct events, or series of events, which are of importance to the instant Motions: (1) the mishandling of petty cash, (2) the Peggy Plyler incident, and (3) sexual harassment against the Plaintiff.

### A. The Mishandling of Petty Cash

As noted, the Plaintiff was expected to help Alvin Hill, the Human Resources Manager, with morale boosters for the employees from time to time. Morale boosters included, for example,

distributing Halloween candy and having a cookout for the employees. The Plaintiff was not expected to pay for these items personally; rather, she was authorized to get money from the Defendant's petty cash supply. Although an informal policy, an employee who took money from petty cash was expected to submit a petty cash voucher with the necessary management approval and then return a receipt along with any unused funds to the Accounting Clerk, Becky Taylor, within a few days.

The problems with the Plaintiff and petty cash occurred between July and August of 2002, and on October 16, 2002, Bookkeeper Brenda Price informed Operations Manager Jeff Akers that she believed the Plaintiff's conduct violated company policy.[1] Specifically, Ms. Price reported that on three occasions the Plaintiff submitted a petty cash voucher for $200.00, claiming the disbursement was for a promotion or morale builder, then returned the funds approximately one week later on or after a salary payday, explaining that she no longer needed the funds. Ms. Price reported that the money amounted to an unauthorized cash advance prior to payday because the Plaintiff had not received the needed management approval for any of these vouchers.

After these reports were received, Mr. Akers began to investigate the Plaintiff's petty cash dealings, including unreconciled petty cash vouchers. Mr. Akers learned that on September 24, 2002, the Plaintiff took $150.00 from petty cash, provided no receipts evidencing any purchases and never returned the money; on October 25, 2002, took $200.00 from petty cash, stating that she had over $150.00 of Halloween candy in her refrigerator already, and did not produce a receipt for this purchase until after her termination; and, on November 12, 2002, took $80.00 from petty cash and,

---

[1] Notably, this began the investigation into the petty cash problem approximately ten days before the Plaintiff alleges she received notice of the incident involving Peggy Plyler, on or about October 26 or 27, 2002, which is discussed more fully in section I.B.

3

again, never produced a receipt and did not return the money until after her termination. At this time, Mr. Akers reported the problem to Eric Fritsch, the General Manager.[2]

On November 19, 2002, Mr. Akers and Mr. Fritsch had a meeting with the Plaintiff to discuss the problematic manner in which she was apparently using the company's petty cash. The Plaintiff admitted taking and returning the money, although asserted that she had no specific memory of the purpose for any of the withdrawals. In regard to the Halloween candy purchase, for which no receipts had been provided, the Plaintiff stated that she chose to buy the Halloween candy on September 24, 2002 because it was on sale. However, Mr. Akers and Mr. Fritsch informed her that without any receipts the money was unaccounted for, and therefore considered "stolen." (It is noteworthy that as of the alleged date of purchase, the company had not yet decided whether it would have Halloween festivities.)

As for the November 12 withdrawal of $80.00 from the petty cash fund, the Plaintiff stated that she withdrew the money to buy printer cartridges, but that as of November 19, she still had not purchased them. However, Mr. Akers believed that when the Plaintiff needed printer cartridges, the normal practice was for her to get them from the supply he kept in his credenza.[3] Given this information, Mr. Fritsch determined that this petty cash withdrawal also constituted an unauthorized taking of company funds.

Due to his conclusion that the Plaintiff had misappropriated company funds, Mr. Fritsch

---

[2]Mr. Fritsch made the initial decision to promote the Plaintiff to Assistant Human Resources Manager. Although Mr. Hill was her immediate supervisor, she also reported to Mr. Fritsch.

[3]Although the Plaintiff asserts that she obtained some printer cartridges from Mr. Akers and also bought some, the undersigned need not make a decision as to the truth of this assertion. Rather, it is Mr. Akers' simply good faith belief on the day the Plaintiff's employment was terminated which is of relevance to this decision.

made the decision to terminate her employment.[4] The Defendant had very strict policies regarding misappropriation, and the Plaintiff had direct knowledge of at least one incident which resulted in the termination of an employee.[5]

**B. The Peggy Plyler Incident**

On or about October 26 or 27, 2002, the Plaintiff received a telephone call from Ms. Peggy Plyler – a recently terminated employee. Ms. Plyler was a counter sales person at the company's Pineville, North Carolina location. She was the oldest employee at that store, and as her name suggests, is a female. In the telephone conversation, Ms. Plyler told the Plaintiff that she felt she was fired because of her age and gender and was considering hiring a lawyer and suing the Defendant. The Plaintiff, apparently sympathetic, took it upon herself to investigate the situation.

First, the Plaintiff notified her direct supervisor, Mr. Hill about Ms. Plyler's claims. Mr. Hill then took the issue to Mr. Fritsch who told them that they should probably just "let it go" because Ms. Plyler's employment had already been terminated as part of a "reduction in force." The Plaintiff was not satisfied with Mr. Fritsch's explanation and continued to investigate what she believed to be the company's wrongdoing, confronting (along with Mr. Hill) the man who fired Ms. Plyler. The Plaintiff and Mr. Hill then contacted one of the company attorneys in Atlanta, Georgia, who explained to them that a reduction in force was to be applied to junior members first. After this, the Plaintiff called another member of Human Resources, Bill Evans, who works in the Atlanta office.

---

[4]After her termination the Plaintiff provided two receipts and later returned the unaccounted for funds. Interestingly, one receipt was for a $129.54 purchase of candy on October 13, 2002, and the other was for a $6.58 purchase of lettuce on October 30, 2002. The Plaintiff had earlier claimed to have spent $150.00 on Halloween candy on September 24, 2002.

[5]Plaintiff was responsible for completing the necessary forms for employees who were terminated, some after a first offense, for misappropriating company funds or property, including the termination forms for Eddie Lanier, who misappropriated a single solar charger.

5

And, on October 29, 2002, the Plaintiff sent to Mr. Evans, at his request, an email outlining the "many illegal and discriminatory actions taken at the Charlotte Distribution Center." This email was passed on to several other members of Human Resources at higher levels.

Following all of this, on November 7, 2002, a division district manager came to the Charlotte location and a meeting was held. At this meeting it was announced that Ms. Plyler would be reinstated.[6] It also became known at this meeting that Mr. Fritsch was extremely angry that the Plaintiff and Mr. Hill had gone over his head with their concerns about Ms. Plyler.

### C. Sexual Harassment

Despite the Plaintiff's sworn statement during her deposition that she loved her job and would have chosen to retain her employment with the Defendant had she not been terminated, she makes the following allegations of gender-based discrimination and/or sexual harassment:

- she was instructed not to hire any more women because women do not work like men;

- after several of the male employees ate lunch at a Charlotte area strip club, one of them referred to her as a "wench" for the rest of the afternoon;

- she was left out of activities like golf in which male employees were invited to participate;

- she was never issued a company credit card, although several male employees were;

- copies of "Parts Pups" (a pornographic magazine formerly printed by the Defendant) were left on her desk with notes saying that her picture should be in the magazine;

- lewd remarks about the Plaintiff were written on the wall of the men's bathroom;

- a purchasing manager once invited the Plaintiff to "suck a little root juice";

---

[6]The Defendant offers an alternative explanation for why Ms. Plyler was reinstated which, for purposes of this Order, is not relevant.

•Mr. Fritsch once asked Mr. Hill if the Plaintiff had moved to Concord so he and the Plaintiff could "shack up";

•a male employee once slammed her against a wall; and

•male managers would make lewd remarks about female applicants and would call each other over the intercom to look at the bodies of female applicants.

**D. Procedural Background**

On December 16, 2002, the Plaintiff filed an administrative Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"). In this Charge, although she marked the boxes indicating that she had been discriminated against based on sex, retaliation, and age, she described the discrimination as follows:

> I.    I was employed by the above named employer, and worked as the Assistant Human Resources Manager. During my employment, I objected to the termination of a female employee, who was in the protected age group. Shortly after I made these objections, I was terminated.
>
> II.   I was told that I was terminated for misappropriating funds.
>
> III.  I believe that I have been discriminated against in retaliation to objecting to practices made unlawful by Title VII of the Civil Rights Act of 1964, as amended, and by the Age Discrimination in Employment Act.

On June 7, 2004, the Plaintiff filed a timely Complaint in the Superior Court of Mecklenburg County, North Carolina, alleging claims for wrongful discharge and discrimination based on retaliation and gender in violation of Title VII, the ADEA, and state public policy.

On July 7, 2004, the Defendant removed the state court action to federal court. Removal has not been challenged and appears proper.

On January 20, 2006, the Defendant filed its Motion for Summary Judgment, which has been

7

fully briefed as set forth above and is, therefore, ripe for determination.

On April 3, 2006, the Defendant filed its Motion to Strike portions of the Plaintiff's affidavit, the 1983/1984 "Parts Pups" covers, the EEOC affidavits of Jim Gray and Alvin Hill, Janet Walls Lully's affidavit, and the summary of a conversation with Brenda Price. Although, as discussed below, none of this evidence is sufficient to create an issue of material fact, the undersigned has considered all of the Plaintiff's evidence and, accordingly, the Defendant's Motion to Strike will be denied.

## II. DISCUSSION OF CLAIMS

### A. Standard of Review

Pursuant to Federal Rule of Civil Procedure 56(c), summary judgment should be granted when the pleadings, responses to discovery, and the record reveal that "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." See also Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979). Once the movant has met its burden, the non-moving party must come forward with specific facts demonstrating a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). However, the party opposing summary judgment may not rest upon mere allegations or denials and, in any event, a "mere scintilla of evidence" is insufficient to overcome summary judgment. Id. at 249-50.

When considering summary judgment motions, courts must view the facts and the inferences therefrom in the light most favorable to the party opposing the motion. Id. at 255; Miltier v. Beorn,

896 F.2d 848, 850 (4th Cir. 1990); Cole v. Cole, 633 F.2d 1083, 1089 (4th Cir. 1980). Indeed, summary judgment is only proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there [being] no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotations omitted).

Regarding the Plaintiff's state public policy claim, North Carolina courts "look to federal decisions [in Title VII cases] for guidance in establishing evidentiary standards and principles of law to be applied in discrimination cases." N.C. Dept. of Correction v. Gibson, 308 N.C. 131, 136, 301 S. E. 2d 78, 82 (1983). Accord Henson v. Liggett Group, Inc., 61 F.3d 270, 277 (4th Cir. 1995); and Phillips v. J.P. Stevens & Co., Inc., 827 F. Supp. 349, 353 (M.D.N.C. 1993) ( "The public policy of North Carolina expressed in N.C.G.S. § 143-422.1 et seq. is essentially identical to the public policy articulated in Title VII").

Accordingly, the undersigned will apply the elements and paradigm of proof established for Title VII claims to determine the Plaintiff's state public policy claims.

### B. Gender-Based Discrimination

#### 1. Failure to Exhaust Administrative Remedies

Title VII requires that a person bringing a claim under Title VII file a Charge of Discrimination with the EEOC within 180 days of the alleged misconduct. 42 U.S.C. § 2000e-5(e)(1). Failure to meet this requirement results in an untimely claim which will be procedurally barred for failure to exhaust administrative remedies. Further, a plaintiff has not exhausted her administrative remedies unless she has actually raised a specific claim with the EEOC. In other words, a plaintiff's claims in her judicial complaint must be reasonably related to her EEOC charge and be expected to follow from a reasonable administrative investigation. Miles v. Dell, Inc., 429

896 F.2d 848, 850 (4th Cir. 1990); Cole v. Cole, 633 F.2d 1083, 1089 (4th Cir. 1980). Indeed, summary judgment is only proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there [being] no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal quotations omitted).

Regarding the Plaintiff's state public policy claim, North Carolina courts "look to federal decisions [in Title VII cases] for guidance in establishing evidentiary standards and principles of law to be applied in discrimination cases." N.C. Dept. of Correction v. Gibson, 308 N.C. 131, 136, 301 S. E. 2d 78, 82 (1983). Accord Henson v. Liggett Group, Inc., 61 F.3d 270, 277 (4th Cir. 1995); and Phillips v. J.P. Stevens & Co., Inc., 827 F. Supp. 349, 353 (M.D.N.C. 1993) ( "The public policy of North Carolina expressed in N.C.G.S. § 143-422.1 et seq. is essentially identical to the public policy articulated in Title VII").

Accordingly, the undersigned will apply the elements and paradigm of proof established for Title VII claims to determine the Plaintiff's state public policy claims.

### B. Gender-Based Discrimination

#### 1. Failure to Exhaust Administrative Remedies

Title VII requires that a person bringing a claim under Title VII file a Charge of Discrimination with the EEOC within 180 days of the alleged misconduct. 42 U.S.C. § 2000e-5(e)(1). Failure to meet this requirement results in an untimely claim which will be procedurally barred for failure to exhaust administrative remedies. Further, a plaintiff has not exhausted her administrative remedies unless she has actually raised a specific claim with the EEOC. In other words, a plaintiff's claims in her judicial complaint must be reasonably related to her EEOC charge and be expected to follow from a reasonable administrative investigation. Miles v. Dell, Inc., 429

F.3d 480, 491 (4th Cir. 2005).

As noted above, the Plaintiff did file a timely Charge of Discrimination with the EEOC; however, her Charge of Discrimination did <u>not</u> assert all the claims which she is attempting to bring before this Court. Although she marked the boxes to indicate that she had been discriminated against based on age, gender, and retaliation, her narrative only explained the retaliation claim. It appears from the totality of the evidence that the Plaintiff marked the age and gender boxes based on her conclusion that <u>Ms. Plyler</u> was discriminated against based on age and gender, especially considering that there are no allegations whatsoever that the Plaintiff was ever discriminated against based on age.

Accordingly, the undersigned finds that summary judgment on the Plaintiff's unexhausted claim (hostile work environment) is proper upon these procedural grounds alone. <u>Accord</u> <u>Miles</u>, 429 F.3d at 492; <u>Adams v. Giant Food, Inc.</u>, 225 F. Supp. 2d 600, 604–05 (D. Md. 2002) (granting summary judgment for the defendant for the plaintiff's failure to exhaust administrative remedies where plaintiff checked the box marked "retaliation," but made no allegation of retaliation in his EEOC charge narrative).

### 2. **Hostile Work Environment Claim**

As concluded above, the Plaintiff's hostile work environment claim is not properly before this Court. However, even if it were, summary judgment should also be granted on the merits.

Title VII makes it an "unlawful employment practice for an employer . . . to fail or refuse to hire or to discharge . . . or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C.A. § 2000e-2(a)(1). Further, Title VII is violated "[w]hen the workplace is permeated with

10

discriminatory intimidation, ridicule, and insult, . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993) (internal quotation marks and citations omitted).

To establish sexual harassment based on a hostile or abusive work environment, a plaintiff is required to prove that the offending conduct: "(1) was unwelcome, (2) was based on her sex, (3) was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment, and (4) was imputable to her employer." Ocheltree v. Scollon Productions, Inc., 335 F.3d 325, 331 (4th Cir. 2003) (citations omitted).

Elaborating on the second element of a claim for a sexually hostile work environment, the critical inquiry is "whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." Id., quoting Oncale v. Sundowner Offshore Serv., Inc., 523 U.S. 75, 80 (1998). A trier of fact may find discrimination where "a female victim is harassed in such sex-specific and derogatory terms . . . as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace." Oncale, 523 U.S. at 80.

Concerning the third element of a hostile work environment claim – proof of conduct sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment – a court must consider all the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris, 510 U.S. at 23. "This standard is designed to 'filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-

11

related jokes, and occasional teasing.'" Ocheltree, 335 F.3d at 333, quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998) (internal citations omitted). See also Hartsell v. Duplex Prod., Inc., 123 F.3d 766, 773 (4th Cir. 1997) ("There is no allegation that Hartsell was inappropriately touched, propositioned, flirted with, taunted, or even ogled."); Hopkins v. Baltimore Gas and Elec. Co., 77 F.3d 745, 754 (4th Cir. 1996) (listing cases involving infrequent, isolated incidents in which court had held that harassment was not severe or pervasive as a matter of law). However, this standard does protect "working women from the kind of male attentions that can make the workplace hellish for women." Ocheltree, 335 F.3d at 333 (citations omitted). Finally, as to the fourth element, where an employee is harassed by a coworker, "the employer may be liable in negligence if it knew or should have known about the harassment and failed to take effective action to stop it," and where the employee is harassed by a supervisor, "an employer may be found vicariously liable." Id. at 333-34.

Applying these legal principles to the facts of this case, and taking the evidence in the light most favorable to the Plaintiff, she has failed to establish a Title VII claim for a hostile work environment based on sex. Looking to the first step in the analysis, the Plaintiff has asserted that the conduct was unwelcome and the undersigned has no reason to doubt this. Accordingly, the Plaintiff has succeeded in establishing the first element of her sexual harassment claim.

As to the second element, that the conduct was based on the Plaintiff's sex, she has only proven this as to some of the conduct. Certainly being slammed against a wall, although no doubt equally unpleasant, is not related to one's gender. Further, the comment directed at Mr. Hill asking whether he was "shacking up" with the Plaintiff is inappropriate, but directed equally at Mr. Hill and the Plaintiff. However, other comments were clearly directed at the Plaintiff due to her gender, such

12

as the lewd remarks on the bathroom wall, the comment regarding "root juice," the "Parts Pups" magazines, and the comments about the bodies of female applicants.

However, the Plaintiff has failed to establish the third element of a hostile work environment, that is, the evidence taken in the light most favorable to the Plaintiff does <u>not</u> show under prevailing Fourth Circuit authority that the conduct was so severe or pervasive as to create an abusive work environment in violation of Title VII. First, although the undersigned does not condone any of the comments or conduct, it is clear from the record and allegations that the comments were relatively infrequent. The Plaintiff worked for the Defendant for approximately nine years, and even if all the allegations occurred in the three years when she was in the Assistant Human Resources Manager position, her description of the incidents does not create a picture of frequent harassment. It is especially difficult to find that the conduct reached a high level of frequency when the Plaintiff made it clear at her deposition that she loved her job and would still be there but for her termination. Nor does the severity of the conduct, although inappropriate, reach the level of actionable conduct in the Fourth Circuit. <u>Accord</u> <u>Dwyer v. Smith</u>, 867 F.2d 184, 187-88 (4th Cir. 1989) (affirming directed verdict in Title VII case even where evidence showed that female police officer was subjected to pornographic material placed in her station mailbox and to other officers' sexually explicit conversations); <u>Hartsell</u>, 123 F.3d at 773-74 (finding the following conduct not sufficiently severe or pervasive: comment that every female in the office had cried like a baby, inappropriate comment upon seeing a buxom woman in company magazine, asking a woman whether she would be a "mini van driving mommy" or "be a salesperson and play with the big boys," statement that a woman should go home and fetch her husband's slippers "like a good little wife," among other comments and conduct not considered gender-specific).

Next, although there is one allegation of a physically threatening incident, where the Plaintiff was thrown against a wall, there is no indication that this was based on her gender. The conduct which was based on her gender amounts to "offensive utterances," which under the totality of the circumstances in this case, simply do not rise to the level of actionable wrongdoing. And, finally, there are no allegations that any or even all of the conduct interfered with the Plaintiff's work performance. To the contrary, the Plaintiff seemed to be happy with her job, and aside from the misappropriation charge, appeared to be performing the functions of her job satisfactorily. Based on these facts, it would be unfounded to conclude that the gender-based conduct was sufficient to create a "hellish" workplace for the Plaintiff. See Ocheltree, 335 F.3d at 333, quoting Baskerville v. Culligan Int'l Co., 50 F.3d 428, 430 (7th Cir. 1995).

Having concluded that the Plaintiff failed to establish that gender-based behavior created an abusive work environment, it is unnecessary to consider the final element of the claim, that is, whether there was a basis for imputing the alleged hostile work environment to the Defendant. In short, even if the Plaintiff had exhausted her administrative remedies under Title VII, which she clearly did not, where the evidence taken in the light most favorable to the Plaintiff fails to show behavior which was sufficiently egregious to create an abusive work environment, the Court would be compelled to grant the Defendants' Motion for Summary Judgment as to the Plaintiff's Title VII hostile work environment claim.

### C. Retaliation Claim

In addition to prohibiting harassment or discrimination in the workplace on the basis of race, religion, or gender, Title VII of the Civil Rights Act of 1964 prohibits employers from retaliating

against employees who attempt to enforce rights under the Act. 42 U.S.C. § 2000e-3(a).[7] To establish a prima facie case of retaliation in violation of Title VII or the ADEA, an employee must show that: 1) the employee engaged in protected activity; 2) the employer took adverse employment action against the employee; and 3) a sufficient causal connection existed between the protected activity and the adverse action. McNairn v. Sullivan, 929 F.2d 974, 980 (4th Cir. 1991), citing Ross v. Communications Satellite Corp., 759 F.2d 355, 365 (4th Cir.1985), abrogated in part on other grounds by Price Waterhouse v. Hopkins, 490 U.S. 228 (1989); Causey v. Balog, 162 F.3d 795, 803 (4th Cir. 1998) (applying same standard to retaliation claim under Title VII and ADEA). See also Hopkins, 77 F.3d at 754; and Williams v. Cerberonics, Inc., 871 F.2d 452, 457 (4th Cir. 1989).

Generally, once a plaintiff has made the required prima facie showing, the burden shifts to the employer to produce a "legitimate nondiscriminatory reason for the adverse action, thereby rebutting the presumption of retaliation raised by the prima facie case." Ross, 759 F.2d at 365, citing Womack v. Munson, 619 F.2d 1292, 1296 (8th Cir. 1980).

If the employer satisfies this burden of production, "the employee bears the ultimate burden of proving retaliation by demonstrating that the employer's proffered reason is pretextual" and that the real motive for the employment action was retaliation. Id., citing Womack, 619 F.2d at 1296. Accord St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-11 (1993).

---

[7] Title 42 U.S.C. §2000e-3(a) specifically provides as follows:

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

Essentially, to prove retaliation a plaintiff must establish that the adverse action would not have occurred "but for" the protected activity. Id. at 365-66. "A causal relationship requires more than simple coincidence... Causation requires [that] the employer's action be the consequence of the protected activities and of nothing else." Bray v. Tenax Corp., 905 F. Supp. 324, 328 (E.D.N.C. 1995).

The Plaintiff is not required to establish the validity of the underlying allegations of a Title VII violation; nonetheless, in order to establish a retaliation claim, "the plaintiff must believe in the validity of the claim, and that belief must be reasonable." Childress v. City of Richmond, 907 F. Supp. 934, 940 (E.D. Va. 1995), aff'd 134 F.3d 1205 (4th Cir. 1998) (*en banc*), cert. denied, 118 S.Ct. 2322 (1998). Accord Mayo v. Kiwest Corp., 898 F. Supp. 335, 337 (E.D.Va. 1995).

For argument's sake, the undersigned will assume that the Plaintiff engaged in "protected activity" prior to her termination, that is, she "investigated" the reasons for Ms. Plyler's employment termination. See 42 U.S.C.A. § 2000e-3(a) (defining "protected activity" as "participating in an ongoing investigation or proceeding under Title VII, or . . . opposing discriminatory practices in the workplace" and defining "participation" as "(1) making a charge; (2) testifying; (3) assisting; or (4) participating in any manner in an investigation, proceeding, or hearing under Title VII"). Accord Laughlin v. Metropolitan Washington Airports Authority, 149 F.3d 253, 259 (4th Cir. 1998) (same). It is also undisputed that subsequent to the Plaintiff conducting this investigation, the Defendant took an adverse employment action against her when it terminated her employment. The Plaintiff's ability to establish a prima facie case depends, therefore, on whether she can establish a causal link between her protected activity and the termination.

In this case, the Plaintiff's evidence clearly fails to create a genuine issue of material fact as

16

to this final element. The investigation into the Plaintiff's misappropriation of petty cash actually began about ten days <u>before</u> the Plaintiff received the telephone call from Ms. Plyler which began the investigation into the reason(s) for her employment termination. Thus, the misappropriation investigation could not have been logically linked to the Plaintiff's protected activity. Further, if the Plaintiff had been dismissed for her involvement in the Plyler incident, it would follow that Mr. Hill would have been dismissed too – for the same reasons.

Much to the contrary, the evidence establishes that the Defendant had a legitimate, non-discriminatory reason for terminating the Plaintiff's employment – namely, for misappropriating company funds. It has been shown that other employees were also dismissed for misappropriation – after only one violation. And while it is true that the Plaintiff did provide some receipts and the remaining cash owed after her termination, her explanations prior to termination certainly did not explain her multiple violations of clearly established company policy, that is, she provided no reasonable explanation of what appears to an objective bystander simply to be an attempt to receive unauthorized cash advances prior to payday.

Finally, for the same reasons she cannot establish a prima facie case of retaliation, the Plaintiff cannot carry her ultimate burden of showing that the Defendant was actually motivated by an unlawful retaliatory purpose. <u>Accord</u> <u>Holder v. City of Raleigh</u>, 867 F.2d 823, 829 (4th Cir. 1989) (finding that employer's belief that employee was not trustworthy a legitimate, nondiscriminatory reason for failure to promote); <u>Brewer v. Dana Corp.</u>, 205 F. Supp. 2d 511, 518-19 (W.D.N.C. 2002) (finding that violation of a work rule is a legitimate, nondiscriminatory reason for discharge); <u>and</u> <u>Grier v. Casey</u>, 643 F. Supp. 298, 309 (W.D.N.C. 1986) (finding that integrity and honesty are legitimate qualifications to demand of an employee).

For these reasons, the Defendant's Motion for Summary Judgment on the Plaintiff's retaliation claim must and will be granted.

### III. ORDER

**NOW, THEREFORE, IT IS HEREBY ORDERED:**

1. The Defendant's "Motion to Strike" (document #44) is **DENIED**.

2. The Defendant's "Motion for Summary Judgment" (document #36) is **GRANTED** and the Complaint is **DISMISSED WITH PREJUDICE.**

3. The Clerk is directed to send copies of this Memorandum and Order to counsel for the parties.

**SO ORDERED, ADJUDGED, AND DECREED.**

Signed: May 8, 2006

*Carl Horn, III*

Carl Horn, III
United States Magistrate Judge